Ralph W. JOHNSON and Hazel F. Johnson, co-partner trading as Johnson Wholesale Merchant Company, Plaintiff,

v.

McKEE BAKING COMPANY, Defendant.

Civ. A. No. 74–183–R.

United States District Court, W. D. Virginia, Roanoke Division.

June 4, 1975.

Ralph Masinter, Masinter & Masinter, Roanoke, Va., for plaintiff.

William B. Poff, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for defendant.

## OPINION AND ORDER

DALTON, District Judge.

Plaintiffs, Ralph W. Johnson and Hazel F. Johnson, partners trading as Johnson Wholesale Merchant Company, are citizens of Virginia who brought this action against defendant, McKee Baking Company, a Tennessee corporation, on October 3, 1974, for $250,000 compensatory damages and $1,000,000 punitive damages. The jurisdiction of this court has thus properly been invoked on the basis of diversity of citizenship and amount in controversy.

Plaintiffs are principally engaged in the wholesale distribution of defendant's "Little Debbie Snak Cakes" in a rather large geographical area around Roanoke, Virginia, under an oral arrangement with McKee Baking Company. The precise territory served by plaintiffs, although it is outlined on a map attached to the complaint and made a part of the record during depositions, is not germane to this opinion. Plaintiffs can, and do, distribute products of other companies not in direct competition with defendant. McKee does not have any other distributors operating within the geographical area covered by plaintiffs.

The distributorship which plaintiffs have for McKee products has existed since January 12, 1964. It has shown a steady growth in dollar sales volume from approximately $60,000 in 1964 to about $275,000 in 1973. Plaintiffs employ two salesmen, three trucks (one of which Mr. Johnson himself operates) and supporting warehouse facilities and equipment in their business.

Defendant, which is engaged in the manufacture, distribution, promotion and sale of multiple snack cakes and vending items for all types of retail markets in 38 states and the District of Columbia, is organized into districts headed by district sales managers who work under the supervision of a vice president in charge of sales.

The matrix of this lawsuit is the close business relationship which McKee has attempted to maintain, primarily through its district sales managers, with plaintiffs. It is apparent from the pleadings and discovery depositions that plaintiffs resent and regard as unwarranted any effort by defendant to monitor or assist their sales activities. Defendant, on the other hand, believes that it has a legitimate interest in attempting to have plaintiffs conduct their business with such efficiency as necessary to maximize their sales of Little Debbie products. It is not surprising that these divergent business philosophies have resulted in conflict between the parties over the years of their association. Such friction has stemmed in particular

from McKee's efforts to service chain store accounts which overlap the territories of various distributors and which are interested in centralized billing and periodic sales promotions that require discounts being given by McKee and its distributors. Plaintiffs have resisted defendant's efforts to supervise the chain store accounts in their territory.

Plaintiffs' disenchantment with defendant came to a head in 1974 when McKee terminated the Little Debbie distributorship of an individual who had been servicing the Richmond Virginia, area. Plaintiffs obviously concluded, because of what they regarded as previous conflicts with defendant, that their distributorship was in jeopardy. This lawsuit resulted.

Though plaintiffs' complaint is divided into two counts, the distinction, if any, between the causes of action asserted is somewhat blurred. A careful analysis of the pleading is required in order to ascertain the gravamen of the alleged causes of action.

After reciting the history and development of the business relationship between plaintiffs and defendant, the complaint contains the following accusatory allegations:

(1) In paragraph 11 it is stated that defendant has noted the "prosperity" of plaintiffs' business and "has made numerous moves towards easing the plaintiffs out of their profitable middle man position."

(2) Paragraph 13 states that defendant has urged plaintiffs to expand their operation while "hoping ultimately . . . to take over the business."

(3) Paragraph 14 contends that "the defendant has thru various and devious means contrived to embarass, intimidate, destroy and impair the health of the plaintiff, Ralph W. Johnson, and cause aggravation and unhappiness to his wife and co-partner, Hazel F. Johnson."

(4) Paragraph 15 alleges cancellation of the Richmond distributorship and that defendant "is planning a like fate for them [plaintiffs]."

(5) Paragraph 16 of the complaint reads:

That because of the activities of the defendant, thru its contrivances and devious methods to harass the plaintiffs in their business, the plaintiffs have been seriously damaged and therefore demand to be compensated from the defendant by way of compensatory damages and punitive damages.

(6) In paragraphs 18 and 19 it is stated that in 1968 defendant asked plaintiffs to enter into a written distributorship contract which contained a two-week termination clause, that plaintiffs refused to sign the contract, and that thereafter McKee "has continued to harass the plaintiff and/or plaintiffs with outlandish demands that the plaintiffs supply it with a customer list, and that the plaintiff and/or plaintiffs allow the company's own men to accompany the plaintiffs' delivery trucks."

(7) Paragraphs 20 and 21 allege that defendant's "harassment tactics" caused Ralph W. Johnson to have a decline in health in 1970 and that while hospitalized with a heart condition, he was visited by a McKee representative. This visit is alleged to have further endangered Ralph W. Johnson's health.

(8) The complaint goes on in paragraphs 22 and 23 to charge defendant with: (a) advising one of plaintiffs' main customers (at an unspecified time) that plaintiffs would not be serving him any longer; (b) setting up promotions with customers in plaintiffs' territory without consultation; (c) announcing price increases to a customer before advising plaintiffs; (d) attempting to have its representatives ride with plaintiffs' drivers on their routes; and (e) asking plaintiffs to fill out route books with the names of customers (allegedly so defendant could learn the identity of plaintiffs' customers and be in a position to take them over).

(9) Paragraph 24 contains this generalized charge:

That at various other times and periods, almost to [sic] numerous to

mention, the defendant, thru its duly constituted agents, representatives and employees, willfully, wantonly and maliciously, with a design to harass and put the plaintiff out of business, made unrealistic, outlandish, unfair and unreasonable demands upon the plaintiffs, obviously designed to embarrass them with their customers, to destroy their business and to ruin the good will which they had established.

Defendant denies that it has made any effort to terminate plaintiffs' distributorship or that it has harassed plaintiffs. Defendant further maintains that its contact with plaintiffs and customers served by them has been part of a normal business relationship (except, McKee claims, for the unusual degree of non-cooperation and suspicion manifested by plaintiffs) and that it has attempted only "to further the mutual interest which plaintiffs and defendant have in increasing their sales of 'Little Debbie' products." In an amended answer defendant has also asserted a plea of the statute of limitations.

Subsequent to the filing of the pleadings referred to above, the parties engaged in extensive discovery proceedings. Interrogatories have been answered, and depositions have been taken from both plaintiffs and the six representatives of defendant who have dealt most frequently with plaintiffs for McKee. Following this discovery defendant moved for summary judgment. Both sides have submitted memoranda of fact and law in support of their respective positions. No affidavits in opposition to summary judgment have been filed by plaintiffs.

■ In approaching the subject of summary judgment, this court is mindful of the fact that disposition of litigation under Rule 56 of the Federal Rules of Civil Procedure is not proper so long as there is any genuine issue as to any material fact. *Bland v. Norfolk and Southern Railroad Company*, 406 F.2d 863 (4th Cir. 1969). 10 Wright and Miller, Federal Practice and Procedure § 2712.

As stated by the court in the *Bland* case cited above:

"Summary judgment is to avoid a useless trial. It is a device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts." 406 F. 2d at 866.

Plaintiffs' allegations can be narrowed to two basic contentions: (A) that defendant intends to, or is attempting to, terminate their Little Debbie distributorship;[1] (B) that defendant has wilfully and maliciously made demands on plaintiffs and made contacts with their customers with the intention of damaging plaintiffs' business and causing them emotional distress.[2]

### A. Alleged Intent to Terminate Plaintiff's Distributorship

■ The first of these contentions can readily be disposed of on motion for summary judgment. There is no evidence that defendant has cancelled plaintiffs' distributorship or made any effort to do so. It is uncontradicted that plaintiffs have, on an uninterrupted basis, served as a McKee distributor since 1964. They continue to be such a distributor. They have not stated a cause of action, therefore, by alleging that McKee has terminated some other distributorship and is, as plaintiffs view it, planning to bring an end to their own relationship with defendant. Without an overt act to constitute a breach of a legal right, there can be no cause of action either in contract or tort.

1. This is the substance of allegations (1), (2) and (4) previously extracted herein from plaintiffs' complaint (paragraphs 11, 13 and 15).

2. This two pronged contention has been made in allegations (3), (5), (6), (7), (8) and (9) as earlier summarized in this opinion from paragraphs 14, 16, 18, 19, and 20–24 of plaintiffs' complaint.

As there has been no termination of plaintiffs' distributorship by defendant, this Court does not reach the question of whether the oral agreement in question is terminable at will after reasonable notice (e. g., *Plaskitt v. Black Diamond Trailer Co.*, 209 Va. 460, 164 S.E.2d 645 (1968)) or only after such reasonable period of time as to enable the distributor to recoup the investment which has been made with knowledge of the manufacturer and in reliance on the distributorship arrangement between the parties (e. g. *Jack's Cookie Co. v. Brooks*, 227 F.2d 935 (4th Cir. 1955) and *Allied Equipment Co. v. Weber Engineered Products*, 237 F.2d 879 (4th Cir. 1956).

■ In a reply memorandum filed with the court, plaintiffs take the position that they can maintain an action for termination of their distributorship on an anticipatory breach theory. But the doctrine of anticipatory or prospective breach is not applicable unless one party to a contract has, by words or equivalent acts, clearly repudiated his contractual obligation. 11 Williston on Contracts, Third Edition, § 1301, p. 78. Such is the law of Virginia. *Simpson v. Scott*, 189 Va. 392, 53 S.E.2d 21 (1949).

■ There have, however, been no acts or words of repudiation by McKee. The defendant continues to sell its products to plaintiffs, and Johnson Wholesale Merchant Company continues to serve as a distributor for defendant. There is, therefore, no case of anticipatory breach presented by the facts of this litigation.

### B. Alleged Intentional Injury to Plaintiffs and Their Business

#### 1. Applicable Law Under Rule 56

In approaching the contentions which plaintiffs have made relative to defendant's alleged efforts to injure them in their business and in their personal health, the Court must note two pertinent provisions of Rule 56, F.R.C.P. Rule 56(c) states:

". . . The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ."

And Rule 56(e) provides:

". . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Defendant has supported its motion for summary judgment by the lengthy depositions and the answers to interrogatories already filed in this case. Plaintiffs, also relying on the same depositions and interrogatories, have filed no affidavits or other counter-summary judgment material contemplated by Rule 56. The Court must, therefore, rule upon defendant's motion on the basis of the record as it is now constituted.

■ The portion of Rule 56(e) quoted above was added for the express purpose of overruling the doctrine that well-pleaded claims and defenses were invulnerable to attack by a motion for summary judgment. 10 Wright and Miller, Federal Practice and Procedure § 2739, p. 710. Such a view, however, has never prevailed in this Circuit. *Berry v. Atlantic Coast Line Railroad Company*, 273 F.2d 572 (4th Cir. 1960) cert. den. 362 U.S. 976, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960).

The Advisory Committee Note on the 1963 amendment to Rule 56 makes clear that it was for the purpose of protecting the summary judgment procedure from the debilitating effect of permitting pleading allegations alone to stand in the

way of granting an otherwise justified summary judgment:

"A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matter sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. . . .

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. . . ."

10 Wright and Miller, Federal Practice and Procedure, § 2739, p. 711.

■ Mere general allegations, therefore, will not prevent the award of summary judgment. *Foy v. Norfolk & W. Ry. Co.*, 377 F.2d 243 (4th Cir. 1967) cert. den. 389 U.S. 848, 88 S.Ct. 74, 19 L. Ed.2d 117 (1967).

2. *The Business Interference Allegations*

■ This Court has carefully examined the record in regard to plaintiffs' assertions that defendant and its agents have attempted to damage them in their business and in their relationships with their customers. Those allegations which have been high-lighted by plaintiffs in their complaint and deposition testimony and which exemplify the type of conduct complained of will now be analyzed.

There is the allegation that in 1968 defendant asked plaintiffs to abandon their oral distributorship arrangement and sign a written contract. That proposed agreement admittedly contained a two-week termination clause. While plaintiffs refused to sign the proffered contract, defendant has continued for seven years to sell products to them as it did before. There is no evidence that defendant pursued any further its 1968 effort (which was then company-wide) to put plaintiffs' distributorship on a written contract basis.

Another factual contention by plaintiffs is that defendant set up promotions with customers in plaintiffs' territory without permission. But there is no contract between the parties prohibiting such action or requiring permission for it. Plaintiffs still sold the merchandise involved. Also, the evidence discloses that the customers involved were chain stores whose retail outlets overlapped the territories of more than one distributor. It is understandable that such customers would prefer, and perhaps require, centralized billing and company-wide promotions. Plaintiffs alone could not accomplish this.

Another instance which plaintiffs would elevate to the status of malicious conduct by defendant is the receipt of price change information by one of their customers before they obtained it. The Court finds from the evidence, however, that the defendant transmitted the price changes in question to both plaintiffs and selected customers. It simply developed that one of the customers received his mail earlier than plaintiffs (though both received the information on approximately the same day).

Requests have occasionally been made by defendant's agents to ride with plaintiffs' salesmen on their route. These requests have been vehemently rejected by plaintiffs on the theory (unsupported by evidence) that defendant was just trying to learn the identity of their customers and then end their distributorship. Defendant, despite being thus rebuked, has continued its relationship with plaintiffs and has in more recent times abandoned even requesting the opportunity to have its sales personnel advise and assist plaintiffs' route men.

Another allegation in support of the complaint is that defendant, in an effort to secure the names of plaintiffs' customers, asked plaintiffs to complete "route books" which would have con-

tained customer identities and pertinent information for servicing those customers. The Court finds from the record that one of defendant's agents made this request while Ralph W. Johnson was ill and after being advised by Hazel F. Johnson that the only customer and route records available were in Mr. Johnson's head. No attempt was ever made to have the route books in question turned over to defendant, and it would appear that the suggestion about their completion was motivated by a sensible desire to record and preserve business information (important to both plaintiffs and defendant) and not by malice or any Machiavellian plot.

All of these complaints made by plaintiffs against defendant must be assessed in light of the nature of the relationship between the parties. Defendant has for the last 11 years afforded plaintiffs sole distributorship rights for its products in a large geographical segment of Virginia. It has done so without any written contractual obligation, and it has refrained from any attempts to establish competing distributors.

So whatever products defendant sells in the area serviced by Johnson Wholesale Merchant Company must be sold by plaintiffs. Defendant, therefore, has a legitimate business and economic interest in seeing to it that plaintiffs' sales of "Little Debbie" products are maximized and that the distributorship of plaintiffs is conducted in such manner as to reflect favorably both upon plaintiffs and defendant. The plaintiffs' interpretation of contacts which defendant has supposedly had with "their" customers must be evaluated in that light.

Pertinent in this respect is the case of *Zoby v. American Fidelity Co.*, 242 F.2d 76 (4th Cir. 1957). In that situation plaintiff alleged that the defendant wrongfully and maliciously interfered with a prospective contract with the Navy. In rejecting plaintiffs' claim, the Fourth Circuit stated:

"Where the alleged interferer is a financially interested party and such interest motivates his conduct, it cannot be said that he is an officious or malicious intermeddler."

\* \* \* \* \* \*

"The concept which we think underlies the privilege [of interfering] is that if an individual acts under an economic interest that is substantial, not merely *de minimus*, wrongful and malicious motives are negatived, for he acts in self-protection. Justification for protecting one's financial position should not be made to depend upon a comparison of the amount of his economic interest in the subject matter with that of others. It is sufficient if the impetus for his conduct lies in a proper business interest rather than in wrongful motives."

242 F.2d at 79–80.

It is the conclusion of the Court that any contacts by defendant with plaintiffs' customers which are disclosed by the record would fall within the scope of the economic interest privilege recognized by *Zoby*. Defendant would also have a clear legal justification and privilege for direct contacts with its own distributors such as plaintiffs. As was held in another privilege situation (though in a different factual context), summary judgment is appropriate despite claims of wilful or malicious conduct if the depositions and other material in the record do not give substance to the allegations. *Time, Inc. v. Johnston*, 448 F.2d 378 (4th Cir. 1971).

3. *Allegations of Intentional Infliction of Emotional and Physical Distress*

Plaintiffs also contend that the business methods of defendant have been directed at causing them physical and emotional harm. If there were evidence to support that allegation, plaintiffs would have a cognizable cause of action.

This Court held in *Ferrell v. Chesapeake & Ohio Railway Emp. Hosp. Ass'n*, 336 F.Supp. 833 (W.D.Va.1971):

"Under the law of Virginia, a contemporaneous physical injury is no longer

a prerequisite to recovery for emotional distress, when this distress is due to a wilful, wanton and vindictive wrong." (Citing *Moore v. Jefferson Hospital, Inc.*, 208 Va. 438, 441, 158 S.E.2d 124, 127 (1967); *Bowles v. May*, 159 Va. 419, 437, 166 S.E. 550, 556 (1932).) [3]

More recently the Virginia Supreme Court has re-stated and refined this principle as follows:

"We adopt the view that a cause of action will lie for emotional distress, unaccompanied by physical injury, provided four elements are shown: One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and emotional distress. Four, the emotional distress was severe." *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 at 148 (1974).

In *Womack* the allegation was that the defendant wilfully, wantonly, maliciously, fraudulently and deceitfully gained entrance into plaintiffs' home and induced him to have his picture taken without knowing that the defendant would then use that picture for identification purposes in a child molestation case against a person unknown to plaintiff.

Plaintiff's allegations in support of this type of cause of action is particularized only to the extent of making reference to Ralph W. Johnson having a

heart attack or nervous breakdown (the evidence is not clear as to which) in 1970 and to his having been visited in the hospital by a McKee representative. As to the hospital visit, Mrs. Johnson had apparently instructed the hospital not to let any of defendant's employees see her husband; but there is no evidence that the McKee employee in question knew this, that he was advised of the directive by plaintiffs or hospital officials, or that Mr. Johnson suffered the slightest of ill effects from the visit.

This aspect of plaintiffs' complaint must be considered against the backdrop of Mr. Johnson's own evidence that he is a man of 60 years of age who has not been in robust health for years and who has a history of extreme nervousness and anxiety which necessitated that he abandon the dry cleaning business as far back as 1951 (long before he ever heard of McKee).

More significantly, however, plaintiffs' alleged cause of action for intentional infliction of emotional distress runs afoul of two hurdles not cleared by any evidence before the Court:

(1) All causes of action in Virginia for personal injury are barred after two years. Section 8–24 of the Code of Virginia. The 1970 episode referred to in the complaint is, therefore, barred by the statute of limitations.

(2) To the extent this aspect of plaintiffs' complaint is not barred by the statute of limitations, it is precluded by a failure to pass the four-prong test previously quoted from *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974). From the evidence before the Court, there is no basis in law for maintaining that defendant was guilty of "outrageous and intolerable" conduct which "offends against the generally accepted standards of decency and morality." This is particularly true because all of McKee's relations with plaintiffs were in a business setting where an economic interest privilege is applicable.

3. Though the court found for defendant since there was no evidence of wilful, intentional or vindictive conduct in a doctor's improper diagnosis and treatment of a patient with a chicken bone caught in his throat.

As plaintiff's case fails to pass one phase of the *Womack* test, the Court need not look to the others.

This Court concludes, therefore, upon examination of the entire record, that, as a matter of law, plaintiffs have no cause of action for the anticipated termination of their distributorship and that there have been no acts of malicious or vindictive conduct by defendants against plaintiffs or their business, within the meaning of the law of the forum.

Former Chief Justice Warren once observed that the Federal Rules of Civil Procedure provide the tools for ascertaining the facts before the curtain goes up on the trial. 10 Wright and Miller, Federal Practice and Procedure § 2739, p. 713. And as pointed out in *Fitzgerald v. Westland Marine Corp.*, 369 F.2d 499 (2nd Cir. 1966), the summary judgment procedure contained in Rule 56 is just such a "tool" because it enables the court to determine whether there should be a trial at all.

It is accordingly ordered that defendant's motion for summary judgment be sustained and that this action be dismissed from the docket, without costs.